[Cite as *Profitt v. Tate Monroe Water Assn., Inc.*, 2013-Ohio-2278.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

KRISTI J. PROFITT, et al.,                    :

    Plaintiffs-Appellants,                  :          CASE NO. CA2012-10-072

                                            :          O P I N I O N
  - vs -                                                    6/3/2013
                                            :

TATE MONROE WATER                             :
ASSOCIATION, INC., et al.,
                                            :
    Defendants/Appellees.                   :
                                            :


CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2010 CVH 01437


Carl W. Zugelter, 1285 West Ohio Pike, Amelia, Ohio 45102, for plaintiffs-appellants

Schroeder, Maundrell, Barbiere & Powers, Jay D. Patton, 5300 Socialville-Foster Road, Suite 200, Mason, Ohio 45040, for defendants-appellees, Tate Monroe Water Association, Inc. and Barbara Adamson

Thomas R. Schuck, 425 Walnut Street, Suite 1800, Cincinnati, Ohio 45202, for defendants-appellees, Tate Monroe Water Association, Inc. and Barbara Adamson

Robert J. Byrne, 150 East Gay Street, 21st Floor, Columbus, Ohio 43215, for defendant-appellee, Ohio Department of Job & Family Services


**M. POWELL, J.**

{¶ 1} Plaintiffs-appellants, Kristi J. Profitt and Michael Profitt, Sr., appeal a decision of

the Clermont County Court of Common Pleas, granting summary judgment on their negligence claim in favor of defendants-appellees, Tate Monroe Water Association, Inc. (Tate Monroe) and Barbara Adamson.[1]

{¶ 2} On December 2, 2008, at approximately 6:30 a.m., Tate Monroe, a private water company, was notified that there was a break in one of its water main lines and that water was running out onto State Route (S.R.) 756 in Clermont County, Ohio. At approximately 7:50 a.m. that morning, Kristi was traveling along S.R. 756 on her way to work. The weather conditions were dry and cold. As she was driving on S.R. 756, she saw a Tate Monroe truck on the side of the road with its yellow lights flashing. Kristi started driving up a hill, when she "hit a sheet of ice" and lost control of her vehicle causing her vehicle to leave the roadway and flip. Kristi suffered injuries as a result of this accident.

{¶ 3} Kristi and her husband, Michael, filed a complaint against Tate Monroe and Barbara Adamson asserting claims of negligence and loss of consortium.[2] Kristi alleged she sustained serious and permanent physical injuries, incurred medical expenses, and lost wages as a result of Tate Monroe and Adamson's negligence in maintaining and repairing its water line on December 2, 2008. Tate Monroe and Adamson answered and later filed a motion for summary judgment which was granted by the trial court. Appellants now appeal the trial court's decision. As this is an appeal from a summary judgment, our review is de novo, and we construe the following facts in the light most favorable to appellants, as the nonmoving party. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996); Civ.R. 56(C).

---

1. Appellants also named as defendants, John Does 1, 2, 3, and the Ohio Department of Jobs and Family Services (ODJFS). The trial court's decision to grant summary judgment to Tate Monroe and Adamson also resulted in a final judgment being "entered against Plaintiffs on their claims against [ODJFS]." These defendants are not participating in this appeal.

2. Appellants originally filed suit on July 14, 2010, however this complaint was amended on November 8, 2010, to add Adamson as a defendant.

{¶ 4} The record indicates that Kristi was traveling westbound on S.R. 756 towards Felicity, Ohio on the morning of the accident. The relevant portion of S.R. 756 begins where Lenroot Road meets S.R. 756. If traveling westbound on S.R. 756, Lenroot Road is on the north side of S.R. 756, and continuing west on S.R. 756, Glass Road is to the south side of S.R. 756. Shortly after Glass Road there is a private driveway which belongs to Chester Neal. Continuing west, about 200 feet after Neal's driveway, there is another private driveway and just west of this driveway there is a flush hydrant which belongs to Tate Monroe.[3] The second private driveway and the flush hydrant are at the top of a hill.

{¶ 5} Tate Monroe provides water to residents in Clermont County, Ohio. On December 2, 2008, Neal, a customer of Tate Monroe, contacted the Clermont County Communications Center at about 6:30 a.m. to report water "squirting out" of the ground around his driveway and out onto S.R. 756. The Communications Center notified Tate Monroe of this leak. Barbara Adamson, as the "duty person" for Tate Monroe, took the call. Adamson then called Neal, who informed her a water main had broken and water was running onto the highway. Neal testified that water from the line was spraying on the roadway, crossing both lanes of S.R. 756 and was flowing "pretty far down" the hillside to the east of his driveway. Neal explained that the area near his driveway is "all hillside."

{¶ 6} Adamson reported the water main break and that water was running onto the roadway to her supervisor, Jeff Smith, and informed him that she was proceeding to Neal's residence. Upon arriving, she too observed water "running down across the bottom of the driveway onto the highway." Adamson first went to the meter and determined the leak was

---

3. Several witnesses refer to this hydrant as a "fire hydrant," however, it is clear that this hydrant was in fact a flush hydrant. Any references to fire hydrant within witnesses' testimony are understood to be referring to the flush hydrant.

actually in Tate Monroe's service line, rather than the main line.[4]  As the leak was in the service line, Tate Monroe was responsible for repairing the leak.  Adamson contacted Smith again, and reported her observations that the water main needed to be shut off and requested assistance.   She also suggested contacting the Ohio Department of Transportation (ODOT) to have salt spread on the road.  After receiving Adamson's call, Smith contacted Tate Monroe's contractor, Howerton Construction, to request that they report to the scene and repair the service line break.  While waiting for assistance, Adamson used the laptop in her truck to look up the locations of the gate valves between the leak.  The gate valves control the flow of water through the water main, therefore shutting off these valves would isolate the break.  At this time, Adamson's truck was in Neal's driveway.  According to Adamson, while at the edge of the driveway she saw cars approaching the area.  She left her truck and motioned to a driver to slow down.  The driver complied, yet the vehicle still "fishtailed" when it encountered the water.  Adamson witnessed a second vehicle "fishtail" when it encountered the water, and a third vehicle slid and completed a "U-turn in the middle of the road."

{¶ 7}  Two of these motorists were David W. Snider and Elizabeth Anderkin.  Both Snider and Anderkin were traveling westbound on S.R. 756 sometime between 7:10 a.m. and 7:45 a.m.  Both testified that water was coming out of a hydrant and flowing down towards Neal's driveway.  Snider testified that at approximately 7:10 a.m. he saw a lady "with a fire hydrant open and water was coming across the road tremendously."  He observed water coming straight out of the hydrant and flooding "across" the highway, and then "down over the hill" towards Neal's driveway.  According to Snider, there was water and ice on the roadway and it came from the hydrant.  Anderkin testified that as she started going uphill, just

---

4.  A service line is a one-inch plastic line that carries water from a main line to a water meter on a customer's property and then to the customer's residence.

past Lenroot Road, she slowed down because the road appeared "black" or "shiny." Between Glass Road and Neal's driveway, Anderkin's car "spun out" and she hit the embankment on the opposite side of the road right before Neal's driveway. After determining that her passengers were not injured, she continued up the hill. Once she reached the top of the hill, she noticed "water [coming] out of the fire hydrant," and that it was "going down [the] hill and freezing." She testified that the only area she observed to be wet or icy was "from above [Neal's] driveway, down to Glass Road. It's a hill so it was running down." Although both Snider and Anderkin testified that the flush hydrant was open and there was water on the roadway which came from this hydrant, Adamson denies ever opening a flush hydrant that day.

{¶ 8}  After observing these three cars slide, Adamson proceeded down the hill to the first gate valves located near Lenroot Road. Adamson parked her truck at the bottom of the hill next to a guardrail. She then climbed over the guardrail, went over an embankment to turn off the gate valves. Adamson was unable to close off all of the valves. She returned to her truck to retrieve another wrench to assist in closing the valves. While at her truck, Adamson noticed more vehicles were approaching the area of the leaking water. Adamson stepped into the light of her headlights and again motioned with her hands for the drivers to "break." One of these vehicles was a red jeep driven by Kristi. Adamson testified that the jeep did not stop or look in her direction.

{¶ 9}  Kristi, however, does not agree that Adamson or anyone else motioned for her to slow down. Kristi testified that she did not see anyone signal or attempt to warn her of any dangerous condition on the road ahead. Rather, she saw two people inside of a Tate Monroe truck and simply thought they were reading meters. As she was driving up the hill past Lenroot Road, she "hit a sheet of ice" and lost control of her vehicle causing her vehicle to leave the roadway and flip. Neal did not witness the accident, but testified that Kristi's

vehicle went off the roadway and landed on the north side of the road just west of his driveway. Snider, who later drove by the accident scene, this time going eastbound on S.R. 756, observed Kristi's vehicle flipped and off the road. Snider estimated the vehicle "came to rest" about 200 feet from Neal's driveway.

{¶ 10} On appeal from the decision of the trial court granting summary judgment for Tate Monroe and Adamson, appellants raise the following assignment of error:

{¶ 11} Assignment of Error No. 1:

{¶ 12} THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANTS IN GRANTING APPELLEES' MOTION FOR SUMMARY JUDGMENT.

{¶ 13} In their sole assignment of error, appellants argue the trial court erred in granting summary judgment because (1) a private water company owes a duty of care in the maintenance and operation of pipelines as well as a duty to protect persons who travel on the highways adjacent to the pipelines, and (2) genuine issues of material fact remained as to "whether Tate Monroe properly inspected and maintained its water lines, whether Adamson negligently opened the flush hydrant, discharging water into the roadway, whether Adamson's response at the scene of the leak and collision was negligent, and whether Tate Monroe's response to the notice of a water main leak was negligent."

{¶ 14} As this court's review of a trial court's ruling on a summary judgment motion is de novo, we utilize the same standard in our review that the trial court uses in its evaluation of the motion. Under Civ.R. 56, summary judgment is appropriate when "(1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor." *Simmons v. Yingling*, 12th Dist. No. CA2010-11-117, 2011-Ohio-4041, ¶ 19, quoting *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370 (1998). The moving

party has the burden of demonstrating that there is no genuine issue of material fact. *McQueen v. Kings Island*, 12th Dist. No. CA2011-11-117, 2012-Ohio-3539, ¶ 6, citing *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66 (1978).

{¶ 15} The nonmoving party must then rebut the moving party's evidence; it "may not rest on the mere allegations of his pleading, but his response, by affidavit or as otherwise provided in Civ.R. 56, must set forth specific facts showing the existence of a genuine triable issue." *Mootispaw v. Eckstein*, 76 Ohio St.3d 383, 386 (1996). A disputed fact is "material" if it affects the outcome of the litigation, and it is "genuine" if it is supported by substantial evidence that exceeds the allegations in the complaint. *Liegel v. Bainum*, 12th Dist. No. CA2011-06-049, 2011-Ohio-6022, ¶ 10.

{¶ 16} In order to survive a properly supported motion for summary judgment on a claim of negligence, the plaintiff must demonstrate the existence of a duty, a breach of that duty, and an injury resulting proximately from the breach. *Zieger v. Burchwell*, 12th Dist. No. CA2009-11-077, 2010-Ohio-2174, ¶ 13; *Brown-Spurgeon v. Paul Davis Sys. of Tri-State Area, Inc.*, 12th Dist. No. CA2012-09-069, 2013-Ohio-1845, ¶ 31. In the present case, appellants allege Tate Monroe and Adamson owed them a variety of duties, including a duty to inspect and maintain its water lines and a duty of ordinary care.

### A. Duty to Inspect and Maintain

{¶ 17} Initially, appellants argued Tate Monroe had a duty to inspect and maintain its water lines. However, during oral argument before this Court, appellants conceded Tate Monroe did not have a duty to maintain and inspect the water lines. We agree that Tate Monroe did not owe a duty to maintain and inspect its water lines. *See Republic Light and Furniture Co. v. City of Cincinnati*, 97 Ohio App. 532 (1st Dist.1954) (finding that requiring the city to conduct random inspections of the waterworks system where there is no indication of a problem would require the city to dig up the streets and such method would render the cost of

supplying water "prohibitive").

## B. Duty of Ordinary Care

{¶ 18} Appellants assert Tate Monroe and Adamson breached their duty of ordinary care by negligently or deliberately allowing water from the service line to run onto the roadway and by negligently or recklessly opening a flush hydrant located along S.R. 756, causing water to flow onto the roadway.

{¶ 19} The threshold question of the existence of a duty is a question of law. *Barnett v. Beazer Homes Investments, L.L.C.*, 180 Ohio App.3d 272, 2008-Ohio-6756, ¶ 14 (12th Dist.). Duty refers to the relationship between a plaintiff and a defendant from which an obligation arises on the part of the defendant to exercise due care toward the plaintiff. *Howard v. Kirkpartrick*, 12th Dist. No. CA2008-11-040, 2009-Ohio-3686, ¶ 11, citing *Wallace v. Ohio Dept. of Commerce, Div. of Fire Marshal*, 96 Ohio St.3d 266, 2002-Ohio-4201, ¶ 23. A duty may be established by common law, legislative enactment, or the specific circumstances of a given case. *Chambers v. St. Mary's School*, 82 Ohio St.3d 563, 565 (1998). The existence of a duty largely depends on the foreseeability of the injury. *Commerce & Industry Ins. Co. v. City of Toledo*, 45 Ohio St.3d 96, 98 (1989). It is not necessary that the defendant should have anticipated the specific injury. *Re v. Kessinger*, 12th Dist. No. CA2007-02-044, 2008-Ohio-167, ¶ 27. Rather, "the test for foreseeability is whether a reasonably prudent person, under the same or similar circumstances as the defendant, should have anticipated that injury to the plaintiff or to those in like situations is the probable result of the performance or nonperformance of an act." *Commerce & Industry Ins. Co.* at 98. Thus, whether Adamson or Tate Monroe owed appellants a duty turns on whether a reasonably prudent person would have anticipated that Kristi or any other motorist traveling along S.R. 756 would be injured by way of the water from the leak or water from the flush hydrant remaining and freezing on the roadway.

## 1. Leak from Service Line

{¶ 20} Under the facts and circumstances of this case, a duty arose for Tate Monroe and Adamson to act as a reasonably prudent person would in responding and repairing the leak and treating or removing the water on the roadway. The evidence submitted by the parties demonstrates that at 6:30 a.m. Tate Monroe was notified of a "water main" break and that water was "running onto the highway." The reported "water main" break was actually a service line break, and according to Adamson, Tate Monroe had the responsibility to repair the line as Tate Monroe owned the line. Once Adamson reached the scene of the leak, she observed it was cold enough for the water on the roadway to freeze. While at the scene, Adamson observed at least three cars sliding or losing control as the cars came in contact with the water on the roadway. Recognizing that the water on the roadway represented an "emergency situation," she became concerned with people hitting the "ice or hitting that water and sliding out." Adamson began motioning to motorists with her hands to slow down.

{¶ 21} Given the fact that Tate Monroe and Adamson, acting as Tate Monroe's agent, were aware that water was leaking from a pipe owned by Tate Monroe onto a public roadway, in subfreezing weather conditions, and that cars were having difficulty traveling over the roadway where the water and ice accumulated, a reasonably prudent person would anticipate that motorists, such as Kristi, traveling along S.R. 756 would encounter water or ice on the roadway, causing them to lose control of their vehicles. Accordingly, we find a duty arose in this case, under these facts and circumstances, for Tate Monroe and Adamson to exercise ordinary care in its response to the leak and its treatment of the water in the roadway.

{¶ 22} Although Tate Monroe recognized that the water on the road from the service line created a hazardous condition, it argues it did not owe a duty to those traveling on this road because it did not create this hazardous condition. To support this contention, Tate

- 9 -

Monroe points to the testimony of James Gregory Stanley, the general manager of Tate Monroe. Stanley testified that it was his "understanding that the tree roots caused the leak." Tate Monroe further argued pursuant to its written agreement with Neal, that it was Neal's responsibility to keep the meter area clear of foliage. We find no merit to this argument. Although Tate Monroe's contractual arrangement with Neal may allocate duties and responsibilities between them, it has no bearing upon Tate Monroe's duties and responsibilities vis-à-vis those not party to the contractual agreement. *See Beaney v. Carlson*, 174 Ohio St. 409, 416 (1974) (finding that a land owner may not contract away a common law duty by agreement, lease, or any other device).

{¶ 23} Once a common-law duty is found to exist, the fulfillment of that duty is not defined by or limited to a particular course of action. Rather, the defendant is required to exercise that degree of care which an ordinarily careful and prudent person would exercise under the same or similar circumstances. *Commerce & Industry Ins. Co.* at 98. Whether a defendant discharged his duty of care is normally a question for the jury. *Id.*

{¶ 24} When Tate Monroe was notified of the break in the water line at 6:30 a.m., it was also notified that water from the line was running onto the roadway. There was testimony that it would take up to three people to adequately warn motorists traveling along S.R. 756 of the icy conditions. Smith admitted that it would take one person to turn off the valves to isolate the leak and one person on each side of the leak to warn motorists. However, Tate Monroe still only dispatched one employee to the scene. Dave Conn, the distribution supervisor for Tate Monroe, and Adamson testified their trucks were not equipped with warning devices such as signs or cones. Conn further testified that the contractor, Howerton Construction, was responsible for putting up signs or other warning devices in the roadway. Yet, the record indicates Howerton Construction was not contacted until after Adamson arrived at Neal's residence. It is up to a trier of fact to determine whether it was

reasonable for Tate Monroe to dispatch one employee when it knew or should have known its employee did not have the proper equipment to warn motorists of the dangerous condition on the roadway. Moreover, Tate Monroe may not delegate the common law duty of ordinary care to its contractor to insulate itself from liability. *See Pusey v. Bator*, 94 Ohio St.3d 275, 279 (2002) (finding an employer may delegate work to an independent contractor, but may not delegate the duty).

{¶ 25} As to Adamson, we further find reasonable minds could differ in deciding whether Adamson's actions in responding to the leak and the methods by which she warned passing motorists were reasonable under the circumstances. Although Adamson engaged her yellow lights once she was in Neal's driveway and again once she was on the side of the road, there is a question of fact as to whether these lights were visible to motorists. Neal testified he did not believe the truck was visible to the passing motorists when it was in his driveway. Moreover, there is a question as to whether the use of the yellow lights and the hand gestures by Adamson, without more, was sufficient under the circumstances. Indeed, Kristi, herself testified that she saw the flashing yellow lights but believed Tate Monroe was simply reading meters. Also, since there was testimony that Adamson was concerned about motorists hitting the "ice or hitting that water and sliding out," it is for a trier of fact to determine whether it was reasonable for Adamson to discontinue warning motorists with hand gestures and leave the roadway to shut off the gate valves.

{¶ 26} The foregoing leaves unresolved genuine issues of material fact with respect to whether appellees discharged their duty of ordinary care. Once these issues of fact are resolved, reasonable minds may differ in deciding whether Tate Monroe and Adamson acted reasonably under the circumstances in responding to the leak and the water on the roadway.

{¶ 27} In reaching this decision we note "[t]he law does not require what is unreasonable, nor does it condemn an act or omission as negligent which can be done or

prevented only by extraordinary exertion or by the expenditure of extraordinary sums of money incident to the removal of an unusual accumulation of snow and ice." *Mills v. City of Springfield*, 75 Ohio Law Abs. 150, 142 N.E.2d 859, 866 (2d Dist.1956). However, it is for the jury to determine whether Tate Monroe and Adamson did enough, using an "ordinary exertion" of effort to respond to the water leak, including warning motorists of the danger created by the water and ice accumulation on the roadway.

**2. Flush Hydrant**

{¶ 28} There is also evidence that a duty could have arisen due to the opening of a flush hydrant near the scene where Kristi's vehicle left the road. However, a genuine issue of material fact exists as to whether the flush hydrant was ever opened, and if it was, whether it was opened by Adamson or some other agent of Tate Monroe. Tate Monroe asserts that because Adamson testified that she did not open the flush hydrant prior to the accident and no one contradicted this testimony then it is uncontroverted that she did not open the hydrant. We disagree.

{¶ 29} Appellants point to the testimony of Snider and Anderkin, two of the motorists who traveled along S.R. 756 a few minutes prior to Kristi's accident to support their contention the hydrant was opened. Both Snider and Anderkin testified to driving past the flush hydrant and observing water coming out of the flush hydrant, onto the roadway, and down the hill towards Neal's driveway. Furthermore, Michael Profitt testified he saw Adamson open the flush hydrant, albeit after the accident. Adamson conversely stated that she never opened the flush hydrant that morning. Contrary to appellees' assertions, Adamson's testimony that she did not open the flush hydrant is not uncontroverted when considered in light of the testimony of Snider, Anderkin, and Michael. Rather, the contradiction in this testimony not only raises a genuine issue of material fact regarding whether and when the hydrant was opened, but it also raises an issue as to Adamson's

credibility. Summary judgment is inappropriate where the resolution of a factual dispute will depend, at least in part, upon the credibility of the witnesses. *Layer v. Kings Island Co.*, 12th Dist. No. CA2002-10-106, 2003-Ohio-2375, ¶ 14, citing *Turner v. Turner*, 67 Ohio St.3d 337, 341 (1993).

**{¶ 30}** Moreover, there was also testimony that only Tate Monroe had the authority to open the flush hydrant. The record also indicates that a specific wrench is normally used to open these hydrants, and Adamson had one of these wrenches with her that day. Additionally, employees of Tate Monroe and Howerton Construction testified that a flush hydrant could be opened to relieve pressure from the pipe while the line is repaired. Adamson herself admitted this and stated she had opened flush hydrants in the past. In viewing these facts in a light most favorable to appellants, as we are required to do, we find the evidence and the inferences from such evidence is sufficient to create a question of fact as to whether Adamson opened the flush hydrant causing additional water to flow onto the roadway.

**{¶ 31}** Furthermore, it is undisputed that at approximately 7:50 a.m., Kristi, while driving westbound on S.R. 756, encountered ice or "liquid on the road" and lost control of her vehicle causing the vehicle to leave the roadway and flip. However, the source of this water is disputed. Tate Monroe asserts the water was from the leak in the service line. Conversely, appellants assert the water on the roadway which caused Kristi to lose control of her vehicle could have come from the leak in the service line, the flush hydrant uphill from the collision scene, or a combination of both. There is a genuine issue of material fact as to the source of the water which led to Kristi's accident.

**{¶ 32}** The record demonstrates that Kristi's vehicle left the road near Neal's driveway, flipped and came to rest approximately 200 feet west of the driveway. The water from the leak also began west of the driveway and flowed downhill past Glass Road. It is certainly

reasonable for a trier of fact to determine that it was water from the leak that Kristi encountered which caused her to lose control of her vehicle. However, it is equally plausible for a trier of fact to determine that the flush hydrant discharged water, flowing downhill past Neal's driveway, which Kristi's vehicle encountered causing her to lose control of her vehicle. From the foregoing evidence, reasonable minds could differ in deciding whether Kristi lost control of her vehicle due to the water on the roadway from the leak in the service line, or water discharged from the flush hydrant, or a combination of both.

{¶ 33} While the question of the existence of a duty is a question of law, the resolution of that question must await the resolution of the factual disputes concerning witness credibility, whether the flush hydrant was opened, and whether the water from the flush hydrant contributed to Kristi's accident. Summary judgment is not the vehicle for weighing the evidence or determining witness credibility. Only a trial on the merits can resolve such disputes. Accordingly, summary judgment was inappropriate in this case.

{¶ 34} Based on the foregoing, we sustain appellants' sole assignment of error, reverse the judgment of the trial court, and remand the cause for further proceedings in accordance with this decision.

{¶ 35} Judgment reversed and remanded.

RINGLAND, P.J., and PIPER, J., concur.