[Cite as *Lindsay P. v. Towne Properties Asset Mgt. Co., Ltd.*, 2013-Ohio-4124.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| LINDSAY P., | : | |
| Plaintiff-Appellant, | : | CASE NO. CA2012-11-215 |
| | : | O P I N I O N |
| - vs - | | 9/23/2013 |
| | : | |
| TOWNE PROPERTIES ASSET MANAGEMENT CO., LTD, et al., | : | |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV2011-05-1658

Haughey & Deters, LLC, Dennis P. Deters, Laura A. Tholke, 121 West High Street, Oxford, Ohio 45056, for plaintiff-appellant

Droder & Miller Co., L.P.A., A. Dennis Miller, Bradley A. Powell, Zachary D. Bahorik, 125 West Central Parkway, Cincinnati, Ohio 45202, for defendant-appellee, Towne Properties Asset Management Co., LTD

Courtney Haynes, #638-479, Chillicothe Correctional Institution, P.O. Box 5500, Chillicothe, Ohio 45601, defendant-appellee, pro se

**PIPER, J.**

{¶ 1} Plaintiff-appellant, Lindsay P. (Lindsay), appeals a decision of the Butler County

Court of Common Pleas, granting summary judgment in favor of defendant-appellee, Towne

Properties Asset Management Co., LTD (Towne Properties).

{¶ 2} Lindsay, a single mother, moved into an apartment complex operated by Towne Properties with her young daughter. Lindsay occupied an apartment above the one leased to Rhonda Schmidt. Schmidt's boyfriend, Courtney Haynes, lived in Schmidt's apartment even though he was not on the lease. Soon after Lindsay moved above Schmidt and Haynes, she began to complain to Town Properties management about the noise coming from Schmidt's apartment. Oftentimes, the rap music coming from Schmidt's apartment was so loud that it woke Lindsay's young daughter from naps and scared the child.

{¶ 3} On multiple occasions, management would warn Schmidt about the noise, and Schmidt would assure management that the noise would cease. However, it did not. In addition to the loud music, Lindsay could also hear Schmidt and Haynes fighting loudly. Several times, management told Lindsay to call the police when the noise was too loud, which Lindsay did on multiple occasions. Lindsay also placed notes on Schmidt's door, asking that the noise stop. In response to the complaints, Schmidt and Haynes began retaliating against Lindsay by banging on her door and trying to confront her for reporting them to management and the police and for leaving notes. Lindsay reported the banging and intimidating behavior of Schmidt and Haynes to Town Properties management, and management was aware that Lindsay was afraid of her downstairs neighbors.

{¶ 4} Late one night, Lindsay received a message that someone was contacting her through her Facebook account. When Lindsay logged on, Haynes, who was using the alias Curtis Foru, began conversing with her through messages. Haynes began the exchange by stating that he knew the two had had their differences, that he had seen Lindsay upset and crying, and that he knew that things were not "easy for a single mom." Haynes went on to say, "leave all your worries and concerns and troubles behind and have fun with me, let things go beyond and experience excitement together like never before. * * * You will really

like having a friend so close that can satisfy you in so many great ways * * *. Forget the notes this time and just come in." At the end of this first message, Haynes included a link to a pornographic website, which depicted a large African-American man who looked similar to Haynes having sexual relations with a smaller white woman who looked similar to Lindsay. Haynes then commented, "I'm more than willing to do all of that for you in the video. Lets [sic] stop fighting and just enjoy being so near."

{¶ 5} Lindsay immediately suspected that Haynes was the person messaging her, and tried in vain to have Haynes state his real name. On multiple occasions during the exchange, Lindsay tried to have Haynes use his real name, and on multiple occasions throughout the exchanges, Lindsay expressed to Haynes that she was afraid because of the contents of his message. When Lindsay insisted that the messenger identify himself, Haynes turned up the music in his apartment and asked if Lindsay could hear it. Haynes also made several references to their disagreements regarding the loud music, and told Lindsay that his messaging her was "the only way to talk to [her] without all the hostility * * *." Haynes also told Lindsay, "to be real honest, I did all of this cause I can't get you out of my mind, even your voice is so beautiful in my head! I just honestly had to take a chance, even tho its [sic] pretty weird."

{¶ 6} The morning after the Facebook incident occurred, Lindsay went to Towne Properties management and reported what had occurred. Management printed out the Facebook exchange, and told Lindsay to go to the police, which Lindsay did. Lindsay then asked to be let out of her lease because she was afraid of Haynes, and did not feel safe at the apartment complex. Management told Lindsay that it was not possible for her to break the lease, and told Lindsay instead that she could move to a different apartment a few streets over. Lindsay expressed concern that the apartment offered was on the first floor because of safety and accessibility reasons. According to Lindsay, Towne Properties showed her a

different possible apartment, which was located in the "same grouping" as her original apartment. Lindsay considered the apartment so close to her original one "out of the question," and agreed to move into the first-floor apartment. Management then told Schmidt and Haynes that Lindsay was moving and to not have any additional contact with her.

{¶ 7} During the time that Lindsay reported her complaints regarding Schmidt and Haynes, management had become aware that Haynes was not on Schmidt's lease. After the Facebook incident, management told Schmidt that Haynes would have to vacate the property because he was not on the lease. Schmidt then told management that she wanted to add Haynes to the lease, and management began to take steps to add Haynes to the lease, even after being informed of the Facebook incident and being aware of the other complaints. Haynes came into the office and filled out an application, which was intended to include a credit and criminal background check. However, when the credit application came back as indicating a negative credit history, the criminal background check was not performed. Haynes was not added to Schmidt's lease.

{¶ 8} A few days after Lindsay was moved and while he was still living with Schmidt, Haynes broke into Lindsay's apartment and raped her. Lindsay's daughter was also in the apartment and heard her mother being raped by Haynes. Lindsay sustained multiple physical injuries in addition to the psychological impact the rape had on her and her daughter. Haynes was apprehended by police, and was tried and convicted of rape and aggravated burglary. The trial court sentenced Haynes to nine years in prison, and Haynes was classified as a Tier III sexual offender.[1]

{¶ 9} Lindsay filed a civil action against Towne Properties alleging negligence, negligent infliction of emotional distress, and breach of contract. Towne Properties

---

1. This court affirmed Haynes' convictions and sentence in *State v. Haynes*, 12th Dist. Butler No. CA2010-10-273, 2011-Ohio-5743.

answered, and the two parties engaged in discovery. During discovery, Lindsay gave a deposition, as did several employees of Town Properties who were involved in the happenings pertinent to Lindsay's suit. Deponents included Erin Fulmer, the complex manager; Nancy Marquez, the assistant manager; Shawna Wieland, a corporate trainer of Towne Properties' policies; Erick Grossl, the District Manager; Jeff Robbins, a former Maintenance Manager for the complex; and Carol Case, a leasing agent.

{¶ 10} Both parties moved for summary judgment, and the trial court granted Towne Properties' motion. In its decision, the trial court found that Haynes' rape of Lindsay was not foreseeable and that Towne Properties did not fail to take reasonable precautions. The trial court also granted summary judgment regarding the negligent infliction of emotional distress and breach of contract claims. Lindsay now appeals the trial court's decision, raising three assignments of error. Lindsay has not addressed the trial court's grant of summary judgment regarding negligent infliction of emotional distress in her brief, and also acknowledged at oral arguments that she is not challenging the trial court's grant of summary judgment regarding the breach of contract claim. Therefore, we will confine our analysis to the trial court's decision regarding negligence. For ease of discussion, and because they are interrelated, we will discuss Lindsay's first and second assignments of error together.

{¶ 11} Assignment of Error No. 1:

{¶ 12} THE TRIAL COURT ERRED IN GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BECAUSE THERE WERE MATERIAL ISSUES AT FACT TO BE LITIGATED.

{¶ 13} Assignment of Error No. 2:

{¶ 14} THE TRIAL COURT ERRED IN THE ASSIGNMENT THAT THERE WAS NOT A DUTY TO PROTECT OWED TO THE TENANT BY THE LANDLORD.

{¶ 15} Lindsay argues in her first and second assignments of error that the trial court

erred in granting summary judgment to Towne Properties because there are genuine issues of material fact that must be litigated.

{¶ 16} This court's review of a trial court's ruling on a summary judgment motion is de novo. *Broadnax v. Greene Credit Serv.*, 118 Ohio App.3d 881, 887 (2d Dist.1997). Civ.R.56 sets forth the summary judgment standard and requires that (1) there be no genuine issues of material fact to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to only one conclusion which is adverse to the nonmoving party. *Slowey v. Midland Acres, Inc.*, 12th Dist. Fayette No. CA2007-08-030, 2008-Ohio-3077, ¶ 8. The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64 (1978).

{¶ 17} The nonmoving party "may not rest on the mere allegations of his pleading, but his response, by affidavit or as otherwise provided in Civ.R. 56, must set forth specific facts showing the existence of a genuine triable issue." *Mootispaw v. Eckstein*, 76 Ohio St.3d 383, 385 (1996). A dispute of fact can be considered "material" if it affects the outcome of the litigation. *Myers v. Jamar Enterprises*, 12th Dist. Clermont No. CA2001-06-056, 2001 WL 1567352,*2 (Dec. 10, 2001). A dispute of fact can be considered "genuine" if it is supported by substantial evidence that exceeds the allegations in the complaint. *Id.*

{¶ 18} Summary judgment is not appropriate where the resolution of a factual dispute will depend in part upon the credibility of the witnesses. *Layer v. Kings Island Co.*, 12th Dist. Warren No. CA2002-10-106, 2003-Ohio-2375, ¶ 14, citing *Turner v. Turner*, 67 Ohio St.3d 337 (1993). Nor is summary judgment the proper vehicle for weighing the evidence where only a trial on the merits can resolve the dispute. *Wagner v. Ohio State Univ. Med. Ctr.*, 188 Ohio App.3d 65, 2010-Ohio-2561, ¶ 37 (10th Dist.).

{¶ 19} In order to establish a negligence claim, the plaintiff must demonstrate a duty

- 6 -

owed by the defendant to the plaintiff, a breach of that duty, and injury proximately caused by the defendant's breach of duty. *Jeffers v. Olexo*, 43 Ohio St.3d 140, 142 (1989). "Duty, as used in Ohio tort law, refers to the relationship between the plaintiff and the defendant from which arises an obligation on the part of the defendant to exercise due care toward the plaintiff." *Wallace v. Ohio Dept. of Commerce*, 96 Ohio St.3d 266, 2002-Ohio-4210, ¶ 23.

{¶ 20} Generally, landlords do not have a duty to protect their tenants from the criminal acts of third parties. *Doe v. Beach House Dev. Co.*, 136 Ohio App.3d 573 (8th Dist.2000). However, if a "special relationship" exists between plaintiff and defendant, that defendant's duty to protect the plaintiff from harm caused by a third party may exist. *Johnson v. Spectrum of Supportive Services*, 8th Dist. Cuyahoga No. 82267, 2003-Ohio-4404, ¶ 23. Such a duty exists when the landlord "should have reasonably foreseen the criminal activity and failed to take reasonable precautions to prevent such activity." *Id.* at ¶ 18. However, it is not necessary that the defendant should have anticipated the specific injury. *Profitt v. Tate Monroe Water Assn., Inc.*, 12th Dist. Clermont No. CA2012-10-072, 2013-Ohio-2278. Instead, the "test for foreseeability is whether a reasonably prudent person, under the same or similar circumstances as the defendant, should have anticipated that injury to the plaintiff or to those in like situations is the probable result of the performance or nonperformance of an act." *Id.* at ¶ 19, citing *Commerce & Industry Ins. Co. v. City of Toledo*, 45 Ohio St.3d 96, 98 (1989).

{¶ 21} It is well-established in Ohio law that "criminal behavior of third persons is not predictable to any degree of certainty." *Adkins v. RLJ Management Co.*, 5th Dist. Muskingum No. CT2011-0012, 2011-Ohio-6609, ¶ 13. Accordingly, "the foreseeability of a criminal act depends upon the knowledge of the defendant, which must be determined by the totality of the circumstances, and it is only when the totality of the circumstances are 'somewhat overwhelming' that the defendant will be held liable." *Wagner*, 2010-Ohio-2561 at ¶ 23,

quoting *Staten v. Ohio Exterminating Co., Inc.*, 123 Ohio App.3d 526, 530 (10th Dist.1997); *see also Brown-Spurgeon v. Paul Davis Systems of Tri-State Area, Inc.*, 12th Dist. Clermont No. CA2012-09-069, 2013-Ohio-1845, ¶ 33. "The mere fact that misconduct on the part of another might be foreseen is not of itself sufficient to place the responsibility upon the defendant * * * it is only where the misconduct was to be anticipated, and taking the risk of it was unreasonable, that liability will be imposed for consequences to which such intervening acts contributed." *Wagner* at ¶ 25. Stated another way, "when liability is asserted against a landowner for the criminal acts of third parties, the burden is upon the plaintiff to establish that the owner knew or should have known about the assailant's dangerous propensities or knew the attack was imminent." *Adkins*, 2011-Ohio-6609 at ¶ 15.

{¶ 22} Based on the foregoing legal standard, we must decide if there exist genuine issues of material fact regarding whether Haynes' criminal act or dangerous propensities were to be anticipated and whether Town Properties' actions in regard to its willingness to take the risk of such criminal acts were unreasonable. After reviewing the record, we find that there are genuine issues of material fact that require litigation.

{¶ 23} Although the trial court determined that Haynes' rape of Lindsay was not foreseeable, we find that reasonable minds could reach different conclusions on this issue so that summary judgment is not appropriate. Viewed in a light most favorable to Lindsay, the record indicates that Towne Properties management was aware that Lindsay was frightened of Haynes because of his actions toward her, and that Haynes' actions demonstrated his dangerous propensities toward Lindsay.

{¶ 24} The trial court noted, and we agree, that the exchanges between Lindsay and Haynes began as mere noise complaints. The record is replete with references to the fact that Lindsay complained of the noise coming from Schmidt's apartment to multiple entities, including Towne Properties management, the police, as well as Schmidt and Haynes directly.

Upon being faced with Lindsay's complaints, Haynes and Schmidt confronted Lindsay, often banging on her door and trying to confront her. Lindsay testified that while Schmidt and Haynes never made any explicit threats to her, she was nonetheless "terrified" because Schmidt and Haynes would bang on her door and scream at her through the door. The record also makes reference to Haynes banging on Lindsay's door with a fire extinguisher and looking "menacing" at her. Lindsay testified that it was "absolutely terrifying" every time her door was pounded upon, that the pounding and yelling was done so in a "threatening manner," and that she informed Towne Properties management "how menacing it was to have somebody pounding on your door and screaming at you through the door."

{¶ 25} The record reveals that Towne Properties management was aware that Lindsay was very frightened by her exchanges with Haynes. In a letter Erin Fulmer wrote to the District Manager, Erick Grossl, she stated, "Lindsay then came in a few days later saying that the man downstairs would come up to her front door. He would bang loudly on the door trying to get Lindsey to open the door. She said that he was very upset that she told on him. She was afraid of him because he seemed very angry." Fulmer's knowledge of Lindsay's fear of Haynes is further demonstrated by the following exchange within Fulmer's deposition.

> [Q] So you perceived that [Lindsay] was actually afraid of [Haynes]?
>
> [A] Yes.
>
> [Q] Okay. Did that play into the decision to move Lindsay?
>
> [A] Yes.

Another Towne Property employee wrote to Grossl and stated, "I heard a complaint that the man below [Lindsay] had come to her door pounding, yelling and threatening her. My understanding thru [sic] the other girls in the office was that each time she called the police he would come to her door banging and threatening. She was very afraid of him and did not

answer the door." Carol Case, one of Towne Properties leasing agents, wrote to Grossl that,

> Lindsey had mentioned to me that she had called the police on several occasions and that the resident would retaliate by making even more noise and pounding on her door. At one point, Lindsey did call in tears and express to me that this resident made her feel uncomfortable and that she was not comfortable calling the police for fear of additional retaliation. I expressed to Lindsey that it was important for her to call the police and file a complaint, as this would allow us the means we need to take action on the matter.

{¶ 26} Case, who handled one of Lindsay's specific complaints regarding Haynes' behavior, went to Schmidt's apartment one day to tell Haynes to lower his music. Case spoke to Lindsay after speaking with Haynes to assure Lindsay that Haynes was told to turn down the music, and Case told Lindsay that Haynes had tried to "intimidate" her when she told him to turn down the music. Case was also familiar with Lindsay's fear of Haynes, as she offered to come and sit with Lindsay after the Towne Properties office had closed for the day so that Lindsay would not be alone.

{¶ 27} Beyond the threatening manner in which Haynes pounded on Lindsay's door, the record contains the Facebook exchange during which Haynes contacted Lindsay using an alias.[2] Lindsay testified that the messages on Facebook sent a "shock of terror" through her knowing that Haynes had taken action to learn her identity and how to access her on Facebook, given how much information Haynes knew about her. Haynes made reference to Lindsay as a single mother, that he had seen her crying and upset on occasion, and that he had watched her since she moved in. Haynes went on to say, "leave all your worries and concerns and troubles behind and have fun with me, let things go beyond and experience excitement together like never before. * * * You will really like having a friend so close that

---

2. Lindsay told management that when Haynes was banging on the door, he had his hood up, a reasonable inference being that Haynes did not want to be easily identified.

can satisfy you in so many great ways * * *.[3] Forget the notes this time and just come in."  At the end of this first message, Haynes included a link to a pornographic website, which depicted a large African American man who looked similar to Haynes having sexual relations with a smaller white woman who looked similar to Lindsay.  Haynes then commented, "I'm more than willing to do all of that for you in the video.  Lets [sic] stop fighting and just enjoy being so near."[4]

{¶ 28} While it is true that Lindsay did not click on the link until she reported the exchange to Towne Property management and police, the record demonstrates that the exchange made Lindsay very frightened.  Even absent the pornographic link, the Facebook exchange was sexual in nature, including multiple propositions by Haynes, and indicated that Haynes had somehow found out who Lindsay was and how to access her Facebook page.  Lindsay testified that she considered the message "stalking as soon as I read it."[5]  Lindsay conveyed her belief to Towne Properties management that Haynes' contact via Facebook constituted stalking.  According to the deposition testimony of a leasing agent of Towne Properties, Lindsay told her, "I was contacted last night by the guy that lives below me and he is stalking me on Facebook."

---

3. Counsel for Towne Properties asserted at oral arguments that the Facebook communication had "no sexual connotation."  However, it is reasonable to assume that Haynes' statements regarding "letting things go beyond," "experienc[ing] excitement together like never before," and "having a friend so close that can satisfy you in so many great ways" was sexual in nature, especially when paired with the link to the pornographic website and Haynes' comment that he was willing to perform the acts seen in the pornographic movie upon Lindsay.

4. The record does not contain the actual video, and this court has not viewed the website as included in the Facebook exchange.  However, Lindsay testified to the contents of the video, and at the summary judgment phase, we will construe the facts in a light most favorable to her as the nonmoving party.  We would also note that Towne Properties' counsel asserted at oral argument that Haynes sent Lindsay a separate link to the pornographic video in an email sometime after the Facebook exchange.  However, the record clearly demonstrates that the link to the pornographic video was embedded at the end of the first Facebook communication that Haynes sent Lindsay.

5. Counsel for Towne Properties asserted at oral arguments that the record did not contain any indication that the Facebook communication was considered by any party as "stalking."  However, the record indicates that Lindsay believed it to be stalking, and that Towne Properties was aware of Lindsay's belief that Haynes' conduct constituted stalking.

{¶ 29} When Towne Properties management learned of the Facebook incident immediately after it occurred, management considered it serious enough to instruct Lindsay to inform the police of the exchange, which Lindsay did. It is undisputed that the police did not pursue charges against Haynes because of the Facebook exchange, nor did they investigate the matter.[6] However, that does not change the fact that Towne Properties management was well aware of the history between Haynes and Lindsay and concerned enough about the circumstances to suggest moving Lindsay away from Haynes on the day after the communication occurred.

{¶ 30} While Haynes' Facebook communication alone did not rise to the level of criminal activity, it nonetheless made Towne Properties management even more aware of why Lindsay feared Haynes, and aware of Haynes' escalating behavior toward Lindsay. In fact, Fulmer noted within a letter to Grossl that Lindsay communicated her fear to management regarding Haynes' communication with her. "Lindsay came in to our office complaining that she is afraid of her neighbor as she believes that he is trying to contact her over facebook [sic]."

{¶ 31} Despite the trial court couching the circumstances as merely noise complaints, the record reveals that Towne Properties management recognized that Haynes' behavior focusing on Lindsay was increasing and changing in nature. Fulmer testified during her deposition that management agreed to move Lindsay because Fulmer believed that Lindsay was afraid of Haynes and because of the communication between Haynes and Lindsay. Fulmer further testified that she was cognizant that Haynes' behavior was intensifying, "it was a continued noise complaint, it has escalated from noise from the below unit to now he is contacting her on Facebook." Fulmer also stated, "it was just becoming more than a noise

---

6. The record seems to indicate that the police did not view the pornographic video, as Lindsay testified that she gave the police the printout, but did not testify that she and the officer viewed the pornographic video together.

complaint with him contacting her and going up to her door." Fulmer also testified that after Lindsay reported the Facebook incident, Fulmer contacted Grossl and explained to him the escalating nature of Haynes' conduct.

> I just explained to him what I read at the time on the Facebook and just let him know at this point it had gone from a noise complaint and *it has escalated*, now he is contacting her. And at one point he did knock on her door. And that at this point *it's just becoming something other than a noise complaint*.

(Emphasis added.)

{¶ 32} In light of Towne Properties' knowledge of Haynes' hostility and preoccupation with Lindsay, along with the uninvited sexual suggestions he made toward her, the totality of the circumstances indicate that Towne Properties may have been aware of the foreseeability of Haynes' criminal act. Therefore, genuine issues of material fact remain regarding the foreseeability of Haynes' eventual uninvited entrance into Lindsay's residence and Haynes' nonconsensual sexual conduct with Lindsay.

{¶ 33} This court is cognizant that the criminal acts of third parties are very difficult to predict and that a landlord does not generally have a duty to protect its tenants from the criminal acts of third parties. However, there are issues of fact regarding whether Towne Properties should have reasonably foreseen Haynes' criminal activity. The record demonstrates that Towne Properties was aware of how Haynes was acting toward Lindsay, and that Lindsay was "scared," "terrified," and that Lindsay felt threatened. The record also demonstrates that Towne Properties was aware of Haynes' dangerous propensities, as it knew that Lindsay felt threatened by Haynes to the point that an employee offered to sit with Lindsay even after business hours so that she would not be alone. Towne Properties was also made aware of Haynes' Facebook communication with Lindsay and that he propositioned her sexually, including statements that he could not get Lindsay out of his mind. Towne Properties told Lindsay that it was "taking care of it" in regard to Lindsay's fear

of Haynes and the developing circumstances, and asked Lindsay to contact police so that such police records would allow Towne Properties "the means we need to take action on the matter." Towne Properties also told Lindsay that it would "keep an eye on" the relations between Haynes and Lindsay. Despite being aware of the threat Haynes posed Lindsay, Towne Properties continued to allow Haynes to live in Schmidt's apartment and even attempted to add him to the lease. Summary judgment is simply not proper here, given that only a trial on the merits can resolve whether Haynes' criminal activity was foreseeable.

{¶ 34} Based on the totality of the circumstances, reasonable minds could also differ as to whether Towne Properties took reasonable steps to protect Lindsay from Haynes' dangerous propensities. Summary judgment is inappropriate, given the conflicting testimony as to whether Towne Properties took reasonable steps to protect Lindsay and the need for a trier of fact to weigh and determine witness credibility regarding these pertinent issues.

{¶ 35} First, the record contains conflicting testimony as to whether Lindsay asked to be released from her lease after the Facebook incident. Lindsay specifically testified, "I asked them what can be done about this. I told him I was scared. I told them I wanted to leave. I didn't want to stay here anymore with this type of behavior going on around me and they immediately told me that that was not an option." However, Fulmer denied that Lindsay ever asked to be let out of her lease, and testified that no one discussed the possibility of letting Lindsay out of her lease.[7] Contrary to Fulmer's testimony, Lindsay testified that Towne Properties management told her that she could not break her lease and that relocating her to another apartment in the community was the "only thing they could do."

---

7. Counsel for Towne Properties asserted at oral argument that there was "no evidence that [Lindsay] asked to be released" from her lease and that Lindsay only asserted that she asked to be let out of her lease in an affidavit submitted to the court after her deposition was taken. However, one can reasonably read Lindsay's deposition testimony and reach the opposite conclusion.

{¶ 36} This issue is one of credibility that must be determined by a trier of fact and is important to the analysis of whether Towne Properties took reasonable steps to protect Lindsay once it was aware of Lindsay's fear of Haynes. While Fulmer asserted that Lindsay did not want out of her lease, Lindsay testified that she specifically asked to be let out because she was fearful of Haynes. Although Towne Properties management stated that letting someone out of their lease was not a possibility, the testimony of Shawna Wieland, Towne Properties' senior corporate trainer, indicates otherwise. Wieland testified that "there are exceptions where we will let people out of leases if the district manager and the manager are okay with it, but it's not a policy. It's not a lease agreement clause, it's scenario." Wieland also testified that she was aware of circumstances "where people have been let out of their lease because they feel unsafe," and that Towne Properties had let tenants out of their leases before.[8]

{¶ 37} Whether Towne Properties refused to let Lindsay out of her lease is a material fact that can only be resolved at trial. The issue is material because of Towne Properties' claim that it took reasonable steps to protect Lindsay. Instead of letting Lindsay out of her lease, Towne Properties moved Lindsay to another apartment within close proximity to her old apartment and in close proximity to Haynes. Despite Lindsay expressing her concern regarding living on the first floor where she feared for her safety, Lindsay testified that Towne Properties told her that moving her to the other apartment was the "only thing they could do." Wieland's testimony directly contradicts Towne Properties' statement to Lindsay, and indicates that it was possible for Towne Properties to let Lindsay out of her lease so that she could move away from the complex, and away from Haynes.

{¶ 38} The circumstances are further compounded because of the way in which

---

8. Towne Properties' counsel suggested at oral arguments that the record did not contain evidence that Towne Properties let tenants out of their leases. The record, however, does appear to contain such testimony.

Towne Properties addressed Haynes after Lindsay moved. Instead of moving Lindsay quietly and then making Haynes vacate the property, Fulmer specifically told Schmidt and Haynes that Lindsay was moving and warned them to stay away from her.[9] Fulmer then began the process of trying to add Haynes to Schmidt's lease. During her testimony, Fulmer admitted that she told Haynes and Schmidt not to contact Lindsay. "I told them that the neighbor was moving and that they're not to have any contact with her in the hallway. And I believe at that time I explained to him that he needed to fill out an application." Fulmer also stated in her letter to Grossl that she told Schmidt and Haynes that they were not to have any contact with Lindsay.

{¶ 39} Although Towne Properties was sufficiently concerned about Lindsay's safety that they moved her, Fulmer, by directly talking to Haynes and informing him that Lindsay was moving, may have exacerbated the circumstances. According to Marquez, an assistant manager, Fulmer's informing Haynes and Schmidt that Lindsay was moving and telling them not to have contact with Lindsay was "unusual" and not "something that would have been done. It wasn't policy to do that or it wasn't common practice * * * because it's not anyone else's business where someone is moving. We would never give that information out to anyone." Only a jury can decide what weight to give the fact that Towne Properties had knowledge that on more than one occasion when Lindsay reported Haynes to authorities, he would retaliate by confronting her. Fulmer gave Lindsay's private information to Haynes by telling him that she was being moved, and Fulmer's communication with Haynes and Schmidt is undisputed from the record.

{¶ 40} In addition to not letting Lindsay break her lease, expressly informing Haynes that Lindsay was moving, and then placing Lindsay in a first-floor apartment even though she

9. Towne Properties' counsel asserted at oral arguments that there was not "anything in the evidence" to suggest that management told Haynes to stay away from Lindsay. However, the record indicates otherwise.

expressed concern for her safety, Towne Properties also began the process of adding Haynes to Schmidt's lease. When various facts are put into context with one another, it creates a question of fact as to whether Town Properties took reasonable steps to protect Lindsay.

{¶ 41} The record indicates that Towne Properties management often deemed persons who caused trouble within the apartment complex as being "banned" from the complex. A letter would be issued notifying the recipient that he or she was banned from the complex and would be considered a trespasser if found at the complex again. The record contains seven examples of such notifications, as well as a template letter used by Towne Properties management. Although Towne Properties management issued notifications to others who caused trouble at the complex, Haynes never received any similar admonition, and instead, was given the opportunity to be added to Schmidt's lease. Instead of deeming him "banned" for his prior actions and behavior toward Lindsay, Towne Properties went through the initial steps necessary to add Haynes to Schmidt's lease, including having him fill out an application and performing a credit check. While Haynes raped Lindsay before he was ever added to Schmidt's lease, the fact that Towne Properties was willing to add Haynes to Schmidt's lease, instead of banning him from the property, while knowing of his potential dangerous propensities raises questions of material fact regarding whether Towne Properties should have anticipated an injury to Lindsay as the probable result of its actions.

{¶ 42} Our decision today in no way indicates our belief as to what the ultimate decision on the merits may be. Instead, our review of the record merely establishes that summary judgment is not proper in this case because there are genuine issues of material fact to be litigated, neither party is entitled to judgment as a matter of law, and reasonable minds can come to different conclusions regarding the issues discussed herein. Moreover, summary judgment is improper where several issues depend upon witness credibility and the

weight of the evidence.

**{¶ 43}** Accordingly, we sustain Lindsay's first and second assignments of error and remand to the trial court for further proceedings.

**{¶ 44}** Assignment of Error No. 3:

**{¶ 45}** THE TRIAL COURT ERRED IN NOT GRANTING PLAINTIFF'S PARTIAL SUMMARY JUDGMENT.

**{¶ 46}** Lindsay argues in her third assignment of error that the trial court erred in not granting her motion for summary judgment. Lindsay argues that Towne Properties engaged in reckless misconduct by moving Lindsay to the first-floor apartment and for not making Haynes leave the property. However, given our analysis of the first two assignments of error, we overrule Lindsay's third assignment of error.

**{¶ 47}** Judgment affirmed in part and reversed in part, and the cause is remanded for further proceedings.

RINGLAND, P.J., and M. POWELL, J., concur.