[Cite as *Pressler v. Franklin*, 2017-Ohio-1408.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|  |  |  |
|---|---|---|
| TAMRA PRESSLER, ADMINISTRATRIX OF THE ESTATE OF CODY PRESSLER, | : | |
| | : | CASE NO.   CA2016-06-050 |
| Plaintiff-Appellee, | : | |
| | : | O P I N I O N |
| | | 4/17/2017 |
| - vs - | : | |
| | : | |
| THE CITY OF FRANKLIN, OHIO, et al., | : | |
| | : | |
| Defendants-Appellants. | : | |
| | : | |

CIVIL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 14CV86307

John C. Camillus, P.O. Box 141410, Columbus, Ohio 43214, for plaintiff-appellee

Schroeder, Maundrell, Barbiere & Powers, Lawrence E. Barbiere, Jay D. Patton, 5300 Socialville Foster Road, Suite 200, Mason, Ohio 45040, for defendant, city of Franklin, Ohio and appellants, Peggy Hembree, Gerry Massey, and Dave Hatfield

**PIPER, J.**

{¶ 1}   Defendants-appellants appeal a decision of the Warren County Court of Common Pleas denying their motion for summary judgment in a suit filed against them by plaintiff-appellee, Tamra Pressler.

**Initial Facts**

{¶ 2} In 2011, a 9-1-1 dispatcher received a call from Laura Chasteen, who reported hearing yells for help. However, Chasteen could not identify exactly where the yells were coming from. In full, the 9-1-1 call was recorded as follows:

Dispatcher: 911 what is your emergency?[1]

Caller: Ah, I live down here over by the river and we where [sic] standing outside and we heard some man screaming "Help" "Help" and we ran back here and we could hear him crying but we cannot see anybody….

Dispatcher: Where do you live?

Caller: Ah, it's Ruthy what street do you live on? What street do you live on? What street? It's, it's, it's over by the river bank….

Dispatcher: Ok, can you tell me where you are so I can send an officer out to you?

Caller: Ah I guess just send them to her house on Eighth Street

Dispatcher: What's the address?

Caller: What's the address? It's the end of Eighth Street. I don't know the address, its [sic] right by the levy [sic] at the end of Eight Street

Dispatcher: And what's your name?

Caller: Laura

Dispatcher: Ok, will you be standing out there so he can find you?

Caller: Yes…

Dispatcher: All right will [sic] send them out…

{¶ 3} Two police officers arrived separately, and each searched different areas along the Great Miami River. It had been raining extensively and the river had risen significantly. The river was observed to be turbulent, with notable debris, and moving with a fast current.

---

1. During the dispatcher's deposition, she testified that the transcript is not accurate because she started her call by saying, "911 *where* is your emergency" rather than what is your emergency.

However, the officers observed no signs of an emergency and could not locate anyone in need of assistance. Each specifically listened for someone yelling, but heard nothing. Both officers ended their investigations, and one officer told dispatch to inform Middletown that someone might be floating down the river toward the Middletown city limits. The dispatcher did as instructed.

{¶ 4} Cody Pressler's body was found four days later along the river bank. However, there is no indication in the record as to when he drowned, when he entered the river, or how he entered the river. Even so, the 9-1-1 dispatcher and one of the two officers who responded were placed on administrative leave with pay for two to three days, but later were allowed to return to work. Police Chief Russ Whitman ordered an internal investigation into the dispatcher's handling of the call and the officers' conduct in responding to the dispatch.

{¶ 5} Cody's mother, Tamra Pressler, filed suit against the city of Franklin, the dispatcher who took the call, as well as the two officers who responded and searched the river area. Pressler alleged that Franklin and the three public employees failed to perform their duties and that such failure caused the death of her son. Franklin filed a motion to dismiss, and Pressler voluntarily dismissed the claims against the city. However, she pursued the claims against the three individual defendants: Dispatcher Peggy Hembree, Lieutenant Gerry Massey, and Officer David Hatfield.

{¶ 6} The three defendants moved for summary judgment, claiming that they were immune from suit. The trial court denied the defendants' motion for summary judgment, finding that genuine issues of material fact remained for litigation. The three defendants now appeal the trial court's decision, raising the following assignment of error.

{¶ 7} THE TRIAL COURT ERRED IN DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.

{¶ 8} Hembree, Massey, and Hatfield argue in their assignment of error that the trial

court erred in not granting their motion for summary judgment because they are immune from suit by virtue of R.C. 2744.03(A)(6).

{¶ 9} Appellate review of a motion for summary judgment is de novo. *Lindsay P. v. Towne Properties Asset Mgt. Co.*, 12th Dist. Butler No. CA2012-11-215, 2013-Ohio-4124, ¶ 16. Civ.R.56 sets forth the summary judgment standard and requires that (1) there be no genuine issues of material fact to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to only one conclusion which is adverse to the nonmoving party. *Slowey v. Midland Acres, Inc.*, 12th Dist. Fayette No. CA2007-08-030, 2008-Ohio-3077, ¶ 8. The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64 (1978).

## Exception to Immunity

{¶ 10} R.C. 2744.03(A)(6) provides a general grant of immunity to an employee of a political subdivision unless one of the following applies: (1) the employee's acts or omissions were manifestly outside the scope of his employment or official responsibilities, (2) the employee's acts or omissions were performed with malicious purpose, in bad faith, or in a wanton or reckless manner, or (3) civil liability is expressly imposed by statute. *Burnell v. Dulle*, 169 Ohio App.3d 792, 2006-Ohio-7044, ¶ 21 (12th Dist.).

{¶ 11} Pressler's suit alleges that her son's death was the result of the defendants' gross negligence and that the three defendants acted willfully, wantonly, and recklessly in performing their duties. The Ohio Supreme Court has clarified the definitions of "wanton misconduct" and "reckless conduct" in the context of immunity for political subdivision employees:

> Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is a great probability that harm will result. * * *

> Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct.

*Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, ¶ 33-34.

{¶ 12} Demonstrating either "wantonness" or "recklessness" is subject to a high standard. *Fields v. Talawanda Bd. of Edn.*, 12th Dist. Butler No. CA2008-02-035, 2009-Ohio-431, ¶ 16. Thus, and although the determination of wantonness or recklessness is typically within the province of the jury, summary judgment is appropriate in instances where there is no evidence that the employees "acted with malicious purpose, in bad faith or in a wanton or reckless manner." *Argabrite v. Neer*, Slip Opinion No. 2016-Ohio-8374, ¶ 17.

{¶ 13} Although Cody's death was tragic and an immense loss to his loved ones, that tragedy does not mean the standard for showing wantonness or recklessness is any less. Instead, appellate courts "must apply the law without consideration of emotional ramifications and without the benefit of 20-20 hindsight." *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, ¶ 76.

{¶ 14} After reviewing the record, especially when avoiding the benefit of hindsight, the defendants' conduct was not wanton or reckless because they did not fail to exercise care in regard to Cody, and their conduct was not a conscious disregard of, or indifference to, a known or obvious risk of harm to Cody. Instead, the record indicates that the defendants went to lengths to gather information, assess the nature of the initial 9-1-1 call, and also to investigate the 9-1-1 call.

**Dispatcher Peggy Hembree**

{¶ 15} Peggy Hembree, the 9-1-1 dispatcher, testified during her deposition that her job as a dispatcher is to obtain as much information as she can when someone calls with an emergency situation. She also testified that another aspect of her job is to determine which

emergency personnel need to be contacted given the specific information garnered from the call. Hembree testified that her first focus during a call is to find out from where the caller is calling, and as efficiently as possible, she makes a judgment as to whether the call merits an emergency responder based on the information she gathers from the caller.

{¶ 16} Hembree testified that in the event of a reported water emergency, she is trained to dispatch the fire department's water rescue team. However, during her 19 years as a dispatcher, she had never dispatched the water rescue team in direct response to a general 9-1-1 call. Hembree testified that on the day of the 9-1-1 call, she dispatched Officer Hatfield specifically to "meet with a caller in reference to her hearing someone scream for help, but not being able to locate them."

{¶ 17} Hembree also testified that she listened to communication between Officer Hatfield and Lieutenant Massey as the two talked about different aspects of their on-site investigation. She also stated that Lieutenant Massey instructed her to call Middletown to inform the police that "it sounds as if someone's floating downstream." Obviously, if Lieutenant Massey and Officer Hatfield found no one in the vicinity of the river, nor saw anyone in the river, if anyone was in the water he or she would have been carried south by the current. Hembree testified that she contacted Middletown dispatch, as directed by Lieutenant Massey, and that she relayed his message of a possible person floating downstream. Hembree testified that she did not consider contacting the fire department during her handling of the 9-1-1 call.

{¶ 18} As a result of her handling the call, Hembree was investigated internally, and the recommended sanction included a suspension, written reprimand, and a verbal reprimand. The reasons given for her discipline included not obtaining as much information as possible during the 9-1-1 call, not calling the fire department's water rescue team, and not fulfilling the police department's mission statement. This was based upon her assumption

that the 9-1-1 caller referenced the river as a landmark to explain the location of her call – rather than the location of the possible cries for help. Police Chief Whitman concluded that Hembree should have asked specific questions, such as, "Can you tell me where the cries are coming from?" However, Hembree testified that in her judgment on the day of the call, Chasteen was distraught and unable to give information with clarity.

> When I asked her where her emergency was, she told me that she could not give me the address where she was at, she could only give me the general area. When she referred to - - that she heard the scream for help here. She gave me that general location of where she lived, which was 8th Street at the levee. After further prompting about where are you so I can send you help, I never got a concrete location of where she was. In my experience, my judgment was to get her help there as quick as I could to the location where she described where she was, so someone on the scene could give me or relay better information about the call for help.

{¶ 19} Hembree appealed Chief Whitman's decision, and the city manager decreased her punishment to an oral reprimand. Hembree testified that she did not agree with receiving any discipline for her actions on the day of the 9-1-1 call. She also testified that she would not have done anything differently on the day of the call, even knowing everything that happened after the call was made. However, Hembree testified that she would have called the fire department if she had believed at the time of the call that the person who was yelling for help was in the river. Instead, Hembree reiterated her belief that the caller only mentioned the river as a landmark to help determine the address from which she was calling.

**Officer David Hatfield**

{¶ 20} Officer David Hatfield testified at his deposition that he was on duty the day of the 9-1-1 call, and that he responded to Hembree's dispatch. When asked whether Hembree had ever indicated that the 9-1-1 caller stated that the person calling for help was in the river, Officer Hatfield testified that Hembree did not state that the cries for help were coming from the river. Officer Hatfield arrived near the river within five minutes of the dispatch, and saw

that Lieutenant Massey was already at the scene near 8th Street. Officer Hatfield then drove to 7th Street, exited his cruiser, and walked up the levee to the bike path. Officer Hatfield testified that he started "checking the area for anyone in distress."

{¶ 21} According to Officer Hatfield's testimony, the river on the day of the 9-1-1 call was "very high," full of debris, and "the water was moving very rapidly." Officer Hatfield encountered two girls walking around the area, and asked them if they had heard anyone yelling for help. The girls responded that they had not heard any distress calls. Officer Hatfield also encountered two men and a woman standing near the sidewalk, the three of whom reported not hearing any cries for help. At that point, Officer Hatfield continued walking around the levee and bike path area. Officer Hatfield then reported to Lieutenant Massey that the people he interacted with had not heard any calls for help. Officer Hatfield then ended his investigation. When asked about his decision to end the investigation, Officer Hatfield testified, "at that point, we only had one report of someone in the area possibly in distress. I had spoken to five people in the area. All five had not heard anything unusual. I walked up and down that area for five or ten minutes. There was no other evidence that would make me believe I needed to stay there."

{¶ 22} Later in his deposition, Officer Hatfield was asked whether he considered the possibility that there was someone in the river at the time he arrived at the scene. Officer Hatfield responded, "that's not the way it was going through my mind. We get calls on the bike path quite regularly. It could have been anything. Whenever you're going to a call, you're kind of running different scenarios in your head, so you kind of know what to do, what to look for when you get there. I was looking for any possibility." He also testified that he did not consider calling the fire department to send a water rescue team at any point during his investigation. According to Officer Hatfield's estimate, Cody's body was found approximately two miles away from the area he had investigated after the 9-1-1 dispatch. Officer Hatfield

received no discipline for his actions on the day of the 9-1-1 call.

**Lieutenant Gerry Massey**

{¶ 23} Lieutenant Gerry Massey was also deposed, and according to his testimony, was working on the day Hembree received the 9-1-1 call. Lieutenant Massey testified that he heard the dispatch regarding possible distress calls, and given his proximity to the scene, responded and offered assistance. Lieutenant Massey was the first to arrive, and met Laura Chasteen on the road once he pulled down 8th Street. Chasteen indicated toward the bike path, and told Lieutenant Massey that she had heard screams coming from that direction. Chasteen told Lieutenant Massey that she heard two yells for help. Lieutenant Massey testified that Chasteen was not "clear exactly" that the yells for help came from the river area, but that he decided to drive toward the levee area. At some point, Lieutenant Massey radioed that Chasteen mentioned that she subsequently heard the voice south of the first location as if it were possible that voice was traveling downstream.

{¶ 24} Lieutenant Massey testified that his vehicle was unable to pull onto the levee because it did not have "enough oomph to get through the muddy grass to get up onto the levee." As such, Lieutenant Massey then backed up and took another route to get nearer to the levee. Once he could pull onto the levee, he turned his police radio off and rolled down all his windows. He then eased down the bike path area to see if he could hear or see anything. Every few feet, Lieutenant Massey would stop and "look around and look down into the river when [he] could see between the trees."

{¶ 25} Lieutenant Massey noticed that the river was "very high, very turbulent," and that the water current was "very fast." He also noticed that there was debris in the river. However, Lieutenant Massey never saw any indication that anyone was in distress, nor did he hear any indications of anyone in distress. Lieutenant Massey also testified that he saw two men in the tree line further down from his location, and that when they neared him, they

looked at him. Lieutenant Massey noticed that one of the men had a fishing pole in his hand, and that both men maintained a "normal gait, steady gaze." Based on circumstances, Lieutenant Massey determined that the men were not witnesses, victims, or suspects.

{¶ 26} Lieutenant Massey's testimony revealed that in addition to the two men not reporting anyone calling for help, he also heard Officer Hatfield report through the radio that Officer Hatfield had talked to multiple people near the other area of the river where he was investigating, and that those people had not "seen or heard anything." Based on the fact that no one on the bike path indicated to him or Officer Hatfield that someone was yelling for help, Lieutenant Massey determined that the possibility that someone fell in the river was "diminished."

{¶ 27} Based on his experience, Lieutenant Massey determined the unsafe and turbulent water conditions would prevent any rescue team from safely entering the water. In his "experience in dealing with the fire department" rescuers would not launch a boat into the river given the risk to the rescuers. At that point, Lieutenant Massey made the decision to have dispatch notify Middletown police, because if someone was in the river, that person would have floated "far downstream" given where the voice was possibly heard, how fast the river was flowing, and how much time had passed since the time of the 9-1-1 phone call.

{¶ 28} Additionally, Lieutenant Massey stated he had previously witnessed the fire department water rescue team's decision against launching a boat because of unsafe river conditions such as those he observed during his investigation. Lieutenant Massey believed that Middletown, which is downstream from the point where he investigated, would have a better angle to possibly launch a boat given that the river widens near a park inside the Middletown city limits and the water slows down given the wider surface over which to flow.

{¶ 29} Lieutenant Massey testified that after he had "cleared" the call, he drove toward Middletown. While he had finished investigating the call, he continued to look into the

water, but was not able to see anything. Lieutenant Massey's investigation lasted approximately 10-12 minutes.

{¶ 30} Lieutenant Massey further testified that he made the decision not to call the fire department only after he "looked down and pulled onto the levee," after seeing how "turbulent" the river was, and after seeing that no one on the bike path was indicating that someone needed help. He also stated that part of his decision-making included the determination that the fire department may be needed for some other purpose, so that asking the fire department to divert its resources to an unidentifiable river rescue was "just not the safest thing to do with a precious resource that we may need to rush into a burning home at any moment." The 9-1-1 call was unsubstantiated despite the officers' attempts to hear or observe someone in need of assistance.

{¶ 31} Lieutenant Massey also testified regarding the disciplinary action that followed his handling of the 9-1-1 call. He testified that after an internal investigation into the matter, he received two days off, which was suspended, as well as a written reprimand. The two days off would not be served if he had no repeat violations for one year. While Lieutenant Massey did not appeal the disciplinary decision, he did not agree with receiving a discipline for his investigation of the call.

{¶ 32} The basis for discipline included Lieutenant Massey not letting the fire department decide the proper course for itself, as well as Lieutenant Massey not abiding by the police department's mission statement. Specifically, Lieutenant Massey was cited for "not working together as a team," "not working in partnership with the community," and "not providing the best service possible." However, the investigation also resulted in Chief Whitman's determination that Lieutenant Massey's intent in regard to committing the violations was "unintentional."

{¶ 33} Chief Whitman issued the verbal reprimand based upon Lieutenant Massey's

decision not to question the two men who were walking near the river, and during the verbal reprimand, indicated the importance of questioning possible witnesses instead of relying on body language and other clues. Lieutenant Massey admitted during his deposition that had he actually spoke with the two men, his investigation would have been more "thorough," but that taking the time to talk to the two men would not have altered the outcome of his investigation.

{¶ 34} Lieutenant Massey was also questioned by his own attorney during the deposition. During that time, he testified that at no time during his investigation did he ever receive any factual information to indicate that anyone was actually in the river. He also testified that his observations and decisions on the night of the 9-1-1 call were based on his experience and training. Lieutenant Massey concluded that in his personal experience, the fire department was "much less likely" to launch a boat if there was merely an uncorroborated statement regarding someone needing help in the river. In other words, he had never known the fire department to launch a rescue boat when there was an uncorroborated, unidentifiable need

### The Defendants' Conduct

{¶ 35} The record indicates that none of the three defendants engaged in wanton misconduct because they did not exhibit a failure to exercise *any* care toward a particular person or Cody specifically. Instead, Hembree gathered as much information from Chasteen as possible, during the brief time the two were engaged on the phone. Due to the lack of clear information, it was important not to delay the dispatch of officers to investigate the urgency of any potential emergency. Officer Hatfield and Lieutenant Massey then investigated the possibility of an emergency situation, not knowing from where the cries originated. Nevertheless, they conducted their respective investigations as though any possible situation might exist. Hembree, Chasteen, and Massey acted with the need for

urgency that an emergency situation requires.

{¶ 36} For these same reasons, and despite some disciplinary action being taken internally by the police department, the three defendants did not engage in reckless conduct because there is no evidence in the record that they consciously disregarded or were indifferent to a known or obvious risk of harm to Cody or any other person. Instead, their conduct was reasonable under the circumstances.

{¶ 37} Even if the distress calls came from Cody, Chasteen's 9-1-1 call, which lacked any detail, could not be verified by either Officer Hatfield or Lieutenant Massey given their direct, on-scene observations. Any criticism of their conduct, or investigation, is not substantially greater than that of mere negligence. Instead, the record is undisputed that on the day of the 9-1-1 call, the river level was very high, quickly moving, and filled with debris. Each of the three defendants quickly deliberated with respect for their professional duties. Decisions not to call the fire department were not made with any indifference or disregard for a potential person in distress. Multiple facts reveal a conscious *regard* by the defendants to address the concern raised by the 9-1-1 call – rather than any conscious disregard or indifference.

## Absence of Disregard or Indifference

{¶ 38} First, Chasteen could not state exactly where the calls for help came from and never told Hembree that they were coming from someone having fallen in, or seen in, the river. Chasteen did not know the address from which she was calling, and the only information Hembree could gather was a general landmark area near the river and a generic street location of 8th Street. Without knowing from where the cries for help were coming, Officer Hatfield and Lieutenant Massey had no concrete reason to believe anyone was in the river, yet they considered the possibility, among other possibilities. Chasteen was unable to identify the location of the person calling for help. Other than speculation from hindsight,

there is nothing in the record to indicate that different action taken by any of the three defendants would have resulted in finding Cody or someone in distress. The immediate response to the 9-1-1 call yielded no identifiable person requiring assistance.

{¶ 39} Second, neither Officer Hatfield nor Lieutenant Massey heard anyone calling for assistance, nor did they observe anyone in need of assistance whether in the river, on the bicycle path, or in the vicinity. Although there was the potential that someone was in the river, possibly moving south, there was nothing in the record to indicate that Officer Hatfield or Lieutenant Massey lacked a good faith effort to develop the possibility, or to locate someone in need of assistance. Despite the moving current and debris, both officers scanned the river for someone, until it became evident that no one was in the vicinity in need of assistance and that if someone had been in the river that individual would have floated south. Police responded to Chasteen's 9-1-1 call, investigated the possibilities surrounding such a call, and were unable to corroborate or verify Chasteen's claim that someone was yelling for help.

{¶ 40} Third, other persons closest to the bike path and river area reported no calls for help. Officer Hatfield spoke directly to five people, each of whom denied hearing anyone calling for help or seeing anyone in distress in, or near, the river. Lieutenant Massey observed two men walking from the river area, and neither appeared to be concerned with someone's safety, nor did they give any indication of a need to report something to the officer. It was obvious to Lieutenant Massey that the two men were not affected by any unusual circumstance.

{¶ 41} While it is true in hindsight that Lieutenant Massey could have expended time interviewing the two men, his decision not to does not amount to a conscious disregard or indifference to a known or obvious risk of harm to a potential person in distress. Lieutenant Massey relied on his extensive training and experience to determine that the two men could

not aid his investigation given that they clearly saw him, yet displayed no sign of emergency or that someone was in need of police help. Had Lieutenant Massey exited his vehicle and expended time to question the two men, it would have subtracted valuable time from his ability to track the river and listen for signs of distress.

{¶ 42} Lieutenant Massey determined that the better use of his time was to continue to search the levee area near the river. Interviewing two men who appeared to have no information would have been an unproductive expenditure of precious time. Lieutenant Massey could be criticized by some for his decision not to stop his vehicle and expend time questioning two men who were overtly observed as unaffected by anything out of the ordinary. Yet, Lieutenant Massey was faced with a situation where either decision he made could be criticized. There is no evidence to remotely suggest his decision was the result of a conscious disregard or indifference to a known or obvious risk of harm to any person in need of assistance or to Cody.

{¶ 43} The dissent does not articulate the significance of the definition of "recklessness it uses to suggest that Lieutenant Massey's actions were possibly reckless" instead, relying upon *Kurz v. Great Parks of Hamilton Cnty.*, 1st Dist. Hamilton No. C-150520, 2016-Ohio-2909, ¶ 26. However, in that case, the court of appeals outlined an analysis very similar to that which we have conducted herein; also concluding that as a matter of law immunity was appropriate. The court in *Kurz* went on to quote the more recent Ohio Supreme Court case of *O'Tool v. Donihan*, 118 Ohio St. 3d 374, 2008-Ohio-2574, paragraph 3 of syllabus, wherein, the court expressed that "recklessness is a perverse disregard of a known risk. Recklessness, therefore, necessarily requires something more than mere negligence. The actor must be conscious that his conduct will in all probability result in injury."

{¶ 44} The *O'Tool* Court explained, "although the determination of recklessness is

typically within the province of the jury, the standard is high, so summary judgment can be appropriate * * * where the individual's conduct does not demonstrate a disposition to perversity." *Id.* at ¶ 75. Contrary to the dissent's suggestion, there is not a scintilla of evidence upon which a jury could reasonably find Lieutenant Massey had a disposition to consciously disregard a known or obvious risk of harm to another, nor is there anything to support a "disposition to perversity."

{¶ 45} Fourth, there was no indication that the fire department could have navigated the turbulent river, nor that they could have rescued an unaccounted for individual. Although the investigation commenced immediately, significant time had passed, the current was rapid, and no one could be found in need of help. None of the defendants had ever experienced the fire department executing a water rescue for a missing person under such dangerous and unsafe circumstances as presented on the day of this particular 9-1-1 call. Again, while each defendant might be criticized for not calling the fire department rescue team, they used reasonable professional judgment in their decision-making process and the failure to call the fire department rescue team would amount to mere negligence at most, not a conscious disregard or indifference to any person or to the circumstances at hand.

{¶ 46} The three defendants gave careful consideration to the choices they made, and they testified to the steps each took to perform their respective duties to the best of their experience and training. While the results were tragic, and the end result was that Cody did somehow and at some time drown in the river, there is nothing in the record to suggest that the drowning was the result of the defendants' willful, wanton, or reckless conduct. While the sympathies are great, and the inclination is strong to engage in hindsight, such must be avoided in applying the law to the facts. After a full and de novo review of the record, we find that defendants are entitled to judgment as a matter of law. As such, it is the order of this court that the judgment of the trial court be reversed, and pursuant to App.R. 12(B), summary

- 16 -

judgment is rendered on behalf of defendants according to law and consistent with this opinion.

{¶ 47} Judgment reversed.

HENDRICKSON, P.J., concurs.

RINGLAND, J., dissents.

**RINGLAND, J., dissenting.**

{¶ 48} I agree with the majority as to the claims against Hembree and Officer Hatfield. However, I disagree with the conclusion that summary judgment was appropriate with respect to the claims made against Lieutenant Massey.

{¶ 49} The Ohio Supreme Court has said that ordinarily the question of whether conduct was reckless is properly left for a jury. *Kurz v. Great Parks of Hamilton Cnty.*, 1st Dist. Hamilton No. C-150520, 2016-Ohio-2909, ¶ 26, citing *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St. 3d 351, 356, 1994-Ohio-368 (1994). In the present case, reasonable minds could reach differing conclusions as to whether Lieutenant Massey's actions or omissions qualified as recklessness.

{¶ 50} According to Lieutenant Massey, while he was driving down the bike path and looking into the river, he noticed two individuals coming up from the river. Based on circumstances such as a "normal gait, steady gaze" and the fact that one of the individuals was carrying a fishing rod, Lieutenant Massey determined that they were not witnesses, victims, or suspects. Without knowing who or why someone had called for help, the decision to not take any time to speak to those two individuals is confounding. Any number of questions could have shed light on the developing situation: (1) had they heard anything, (2) did they observe any other person or people near the river, (3) was the cry for help a result of

an assault or robbery, (4) were the two individuals somehow involved or implicated?

{¶ 51} Even a brief exchange with the two individuals could have shed light on the situation and could have either allayed or triggered Lieutenant Massey's concerns. Instead, the record reflects that Lieutenant Massey did not speak with those individuals and eventually "cleared" the call and notified dispatch to inform the Middletown Dispatch that there may be a person floating downstream. As a result of Lieutenant Massey's failure to investigate or even question these two individuals, we will never know if they had any information that would have been useful in the investigation. Lieutenant Massey's conscious decision to disregard those individuals, despite the failure to identify the cries for help, ultimately resulted in disciplinary action by his department. Since there are disputed issues of fact, a jury should decide the issue of whether Lieutenant Massey's conduct was reckless. Because the decision to affirm summary judgment does not allow the disputed issues to be resolved by a jury, I must respectfully dissent.